County, KY at all. Arguments not to exceed 15 minutes per side. Mr. Dove for appellant. Thank you very much. May it please the court, Mr. Chenoweth, Your Honor, I'd like to reserve three minutes for rebuttal. You may. Thank you very much. Your Honor, this case comes, Your Honors, comes from the appeal of the family of QW from Judge Reeves in the Eastern District of Kentucky's decision, which affirmed the hearing officer in the Exceptional Children's Appeals Board decision which found that QW was no longer eligible for special educational services. This is an issue that seems to be first impression in this circuit. Both the First and the Ninth Circuits have found that educational performance is more than just the academics. And that seems to be the issue that's presented here. It's undisputed that QW is a high-functioning child. It's been diagnosed with autism. It seems like, though, Mr. Dove, that that's the big dispute between you and your brother, counsel, is what consideration took place with respect to QW and his education. And it seems you disagree with Mr. Chenoweth, who says that it was a holistic examination. And I totally disagree with that. I realize that. And I think Judge Reeves, if you look at Judge Reeves' opinion, Judge Reeves' opinion states that the board, on page 7 of Judge Reeves' opinion, it says, on the other hand, the board advances interpretation that educational performance means academic performance, as the New York case courts have held. When we come up on appeal... Judge Reeves also acknowledged, but here, nevertheless, that whatever stance it seemed that the board was taking, Judge Reeves acknowledges or seems to concede that this examination here for this particular young man or little boy included much more than just his grades. I would agree. I would agree that's what Judge Reeves found. But I think if you look at Judge Reeves' opinion, Judge Reeves minimizes, like for instance, Judge Reeves says there were few instances of bullying of Quincy, I mean of QW. Well, that's not exactly accurate. Judge Reeves never addresses the fact that QW had been isolated from eight peers due to incidents of not being able to get along. QW's, he never addressed the fact that QW locked himself in a bathroom and would not come out without his aide coming to get him. He never addressed the fact that this kid is totally isolated, has no friends, does not play, or does not address his self-mutilating behaviors. That is clearly indicated in the record. Now, under, if you look at the analysis of which I think the board has tried to present to this court, that we did look like a holistic approach, that is not exactly what the record shows. If you look at the statements. The record's six volumes. The record's pretty thick. And part of the, and I make a point about this, that it is pretty thick, as you say, because the testimony included, I mean, umpteen people. Director of Special Ed, the teachers, the school system diagnostician, a professor of the educational school, counseling and psychology, biostatistician, professors of this and that. I mean, it's not like there wasn't a great deal of effort applied here to try to come to the right answer. No, no. And I would agree with that, Judge Cook. But if you look at what the school system says, which is in the record, school psychologist Diane Shufford says the adverse effect on his academic performance, that's a question. Kathy Dice, the director of Special Ed, says adverse effect is based on Quincy's academic, or QW's academic performance. And that's a question. Kelly Vinson, we wanted to have a chance to make our determination on how he's doing in our building. I'm wondering if I could get you to focus on the point that there was a lot of testimony, and you're pointing out certainly variations that at times make QW's sound pretty plagued by social and psychological issues. Yes, ma'am. But there's also testimony from teachers who say this child has friends, he gets along, he sits in his seat, he's not disruptive, he has friends in the cafeteria with whom he eats, those sort of things. In the end, feel sorry for us a bit. Our job is to decide whether there's any clear error by Judge Reeves here in the finding of facts. And so as you make your arguments, think about whether you can address that. And I think there is clear error. I think that we have to look at what the definition of adverse effect on educational performance. Now, this circuit has never, and neither has Kentucky, ever addressed or defined educational performance. So what we've got to look at is what is the educational performance for this child. And there is conflicting testimony in the record. Now, what Judge Reeves looked and what the board wants you to look at is that academic performance is the only criteria that we look at. And that's why I digress into why these issues are important to his academic performance. If you look at the purpose of the idea, if you look at the IDEAA, what is the purpose of the idea? It's to mold these children into productive citizens into the community. That's Hoenig versus Doe. That's also quoted in the Maine case, Mr. I versus Maine. Now, here we have a kid that is conflicting testimony. The teachers cannot see the self-mutilating behavior. If you look at what the teachers also said, is that the teachers said... Excuse me. Did the self-mutilating behavior that you're focusing on now occur in school? No. No, we don't have any. But we do have proof that he self-stimulated in school, which is characteristic of autism. The other thing we have, we have proof, is that in school, is that he did isolate himself from kids. He did isolate himself from peers. Counsel, I have a question. You raised what's the key point of the idea, and I would have said it's mainstreaming, to making sure if kids can attend the public schools, they should attend the public schools, rather than going to specialized schools. I think that's clearly one of the objectives of the idea. You can disagree with that, but let me get to my question. You can consider both at the same time. One thing that seems a little dangerous about a rule that says, hey, we want you thinking about everything that's happening at home, when you're putting together the IEP or deciding whether someone is covered by IDEA, is that potentially could cut the other way. In other words, you could have a setting in which some bad things were happening at home, frankly the kind of things that might lead someone to say, this person actually should not be in the public schools. But it turns out whatever those things are, you know, physically once a week hitting the father, or physically once a week hitting a sister, which is not the kind of thing you'd want at school, and that kind of conduct to an extreme would prevent someone from being in school. But for whatever reason, this conduct does not manifest itself at school. You would never say you're not covered by IDEA solely because of problems at home. So it seems to me, I think you've got to be a little careful here. I'm with you that it'll sometimes be the case that what happens at home is indicative of what ought to happen in school. There is going to be some overlap sometimes. For example, ability to do homework. Those two things are going to go together. But I'd be very careful about the idea that things that are manifesting themselves at home necessarily are relevant to what happens under IDEA because I think that could hurt more people than help them, frankly. And, Judge, I think I would agree with you. We're not only addressing the issue of what Q.W. was doing at home. Now, that was the argument. The board was saying, We don't see this here. It only happens at home. And we're saying, That's not accurate. This does happen here. The thing is, if you look at the teachers, the teacher, what's not mentioned in Judge Reeves' opinion, was that how Q.W. just left the classroom, how Q.W. would blurt out in class, how he would not do his homework, how he lost four coats, how he was a subject of bullying. All of these are symptomatic of the child that's in need of services. And the thing that they just... Okay, so if the case is not about a legal issue of home versus school, then you're back to Judge Cook's point, which is there's some deference here given. There's some deference given to this administrative process and these records. And we don't suddenly come in and say, Hey, this is what we think would be the better idea. That's true. You can give deference to the educational opinions of school districts and educators. That's clear. But you can't give deference if they apply the law wrong. Just to be clear, you don't really think there's a legal statutory interpretation question for us? Yes, I do. Okay, go ahead. I think the statutory interpretation is, how are we going to address in this circuit educational performance? Is the educational performance going to be the first and the ninth circuit? Is it going to be encompassing the child and the social aspects of the child? Or is it going to be the very, very strict version of academics only? And I think if you look at the 34 CFR 300.306CI, you draw on several areas of sources to determine eligible, including social and environmental. I thought we agreed at the outset. I thought you and I more or less agreed that the concept that the judge and the record here encompassed far more than grades. I believe it's a large record. No, but I actually went a little farther than that to say that the psychologists testified, school counselors, all sorts of people on the topic that was separate than grades. No, I do agree with you. There were outside clinicians that testified clearly that this is more an issue than just grades. But, I mean, Dr. Nadoff, Dr. Reed. This case wouldn't demonstrate that somehow Judge Reeves and the sixth circuit limit themselves under IDEA to only the scholastics. I think I would have to not totally agree with that. I have one other question. I thought you were about to agree with it. No, I was about totally not to, but I didn't know how to be political about not agreeing. Your brother counsel makes another point, that even if you are correct on the topic of the first prong, that there needs to be a holistic approach. Even if you're correct about that, you've failed to brief or address the second prong, and since your time is up, I'll let you answer the question when you return. The second prong requires that there has to be a demonstration that the child needs special teaching. You know what to think about. Okay, thank you, Mr. Dove. Your Honor, it's Grant Chenoweth for the Board of Education of Fayette County, Kentucky. Mr. Dove, I may please the court. The points that have been raised through questioning for Mr. Dove to respond to certainly are those points that are emphasized in our brief, but specific care to the standard of review on the findings of fact I think does have to be paid attention to. In a 12-page decision, Judge Reeves spent nearly an entire page, it's most of page 9 and into page 10, discussing all the non-academic, summarizing all the non-academic testimony of those individuals who observed QW in the school setting with regard to peer interaction, with regard to his behaviors. He acknowledges there are incidents of bullying. He even says that as to some of those, he explains the teacher's testimony. He weighed all of that testimony, and he says the testimony is that the problem was with the other student who subjected not just QW to negative attention, but also some of his non-disabled peers, and that student had to be segregated from QW and from other students in the class. So Judge Reeves didn't ignore the testimony. It's better than a 1,300-page transcript of testimony, countless exhibits beyond that. This is not really a novel statutory interpretation case. This is really just an application of settled principles? In my opinion, Mr. Dove has tried to set it up as a novel statutory interpretation case, but we didn't even drum in our briefs at the administrative level or at the district court level, we didn't adamantly say that it's academics only. We said there's case law support for it being solely academics unless the state has defined it differently. Mr. Dove has referenced the First and Ninth Circuits. That's in reliance on Maryland law defining educational performance with more detail than Kentucky does and California defining, by administrative regulation, educational performance in more detail than Kentucky does. So it's not the First and Ninth Circuits that have really done anything on this definition. It's them acknowledging that those two states. Would you agree that you can't just have a dichotomy of home versus school, that it's sometimes relevant what's happening at home? For example, the person who just for whatever reason can't do homework. There are certainly instances where a child's behavior at home or manifestations of their disability at home could prevent them from Wouldn't all the circuits agree with that point? I don't know of any court that would disagree with that point. But they would say that's academic. The issue under the Rowley standard is across the board, do those things prevent the child from receiving that basic floor of educational benefit? That's that minimum floor that you're looking at. Do those things at home so interfere with what's going on at school that the school, in fact, can't educate the child? Let me ask you, for example, we just mentioned homework. As I read the blue brief, there was testimony from the mother that he required considerable prompting to do his homework. But I take it the homework did get done as far as the school was concerned. As I understand it, Your Honor, that's correct. If the conditions at home kept him from doing the homework, then that would be something different. What I don't know that the record demonstrates, I did not participate in the hearing, and I've done my best, as you all and your clerks will have done, to try to spend time with the record. All of this relates to the child as an elementary school student. And usually homework is a, in the elementary school context, is a completion concept. It's not part of the grade. It's a are they giving more time to these things at home? Are they spending time with the materials? And less so about have they nailed every single question? Have they shown all their work on a math problem? But if he wasn't turning in homework at all, they would know that, wouldn't they? Or that would have been testified to. I believe that would have been reflected in the teacher's testimony. You have teachers who said, but for learning that he did come to school with an IEP, they would not have been able to pick him out from amongst his peers as a student that had special needs. And that's looking at behavior. That's looking at peer interaction. That's looking at socialization amongst peers. What, in the appellant's brief, what you hear is these isolated incidents, the one instance in the bathroom, the one, the several instances, the allegations of bullying, certainly some of those things may have occurred at school. But what the teacher said is that those were not so out of the norm for other students his age who might, on occasion, have an emotionally terribly bad day, that those things didn't separate him from his same age peers. Those things weren't so remarkable as to cause them to say, we must intervene or we've lost this child. And the second prong of the test that I also am looking forward to Mr. Dove articulating an answer to is that the two-prong test is that the child has a disability that adversely affects educational performance, educational performance being as broadly interpreted as Judge Reeves said it could be and as the Ninth Circuit and the First Circuit have said based on those other states' law, that even if you get to all of that, it's a child who, by reason thereof, by reason of that disability, requires both special education and related services. And despite there being a very significant six-volume transcript with just, you recounted the laundry list of witnesses, specialists that testified, what none of them testified to was any need by QW for anything other than related services, related services such as occupational therapy, physical therapy, speech therapy. The other items one would look for is adaptation of content methodology or special instruction. That's correct. That would be, by example, a student who doesn't process things through reading the instructions on a page. A teacher might have to modify the instructions by delivering them orally to that student. That's a modification of instruction. Or a student who doesn't process things orally, the teacher may have to give them notes, kind of like the pastors use at church with a few words missing, and just is the student following along and can they fill in the words as the, they're given most of it in writing and we're asking them to do a little bit of the oral processing. I just want to, I'm sorry, go ahead. I just wanted to ask, was there any testimony to that effect, that GW or QW could not process the content? There was. Administered by the teachers. There was not. There's no testimony by any of those specialists that he needs the curriculum to be modified. What's the upshot of the absence of that in the record? What result does that produce? It produces, even from the U.S. Department of Education's Office of Special Education Programs, they say that it is a two-part, the second prong is two-part. It's a conjunctive and, and the absence of any testimony of that where the parents bear the burden of proof is a concession that the child is not eligible for special education services. Even if the other were just as Mr. Doug? Even if I rolled over and played dead on the first prong, they've failed to ever address the second prong, and it's never, no facts on that are ever brought up in the hearing. And certainly by this time, with the number of times this has been briefed, if the other side believed there was any testimony on that, we would have seen it cited. The last piece on the testimony that is referenced, I admit that many of the school district experts or staff that testified did reference academics. The laundry list of citations to the record in the appellant's brief and in the reply brief are not inaccurate, but I'll submit that within one page either direction of every one of those quotes that's pulled, you will see those same witnesses testifying about peer interaction, about behavior, about social skills, about communication skills. None of them- Testifying favorably as opposed to- Favorably as to those elements being part of their consideration. You say favorably, at least no worse than the run of elementary school, which can be a tough place. Correct. They're all painted with the, through those pull quotes, all those staff are painted with the notion that they myopically looked at the grades, the report card, standardized tests, and say within, I believe, a page one direction or the other of every pull quote that's cited for that prospect, you will find those same witnesses testifying about things other than academics. Let me take you back a minute ago. You were talking about this second prong and you referred to the language from the statute about special education and related services. And I hadn't thought about this. You said that they are conjunctive so that a child who needs related services, occupational therapy, speech therapy, et cetera, doesn't get them as long as the child doesn't need special education. Is that the position? That's correct. It's also the position of the U.S. Department of Education Office of Special Education Programs. Is there a particular regulation or a CFR that you would cite for that? It's, in fact, within one of the three, the references in the appellant's brief, the letter to Lybarger, the letter to Anonymous, the letter to, there's a third one, there are three letters in the record. Within those are where the U.S. Department of Education has articulated that standard interpreting their own ratings. Okay. You know, one question I had when I looked at this case was, well, you know, it's good that he's got the type of autism that allows him to function well in school. And what's the big deal from the school district's perspective? Say he's covered by the idea the IEP is going to be easy. Instead of having 10 or 15 things that need to be done, it's going to have one or maybe two sometimes. And just do it. Is your answer, the answer, well, it's expensive to do that? The answer, in fact, is not that. The answer is that both the State Department of Education and the U.S. Department of Education keep track of the over-identification of students because schools receive additional funding for every child that's on their special education roster. Every year they submit a list to the state. That gets passed on through the feds. The Federal Department of Education is worried about having too many people covered under IDEA? Significantly worried about that because it is a flow of funds to the state. But why is it expensive if it's a minor IEP? It's just a set amount? It doesn't factor in? That other than for a few, my recollection is, other than a few categories of disability not related to this student, so I don't have that information, that it is just a set amount. It is a dollar figure that flows from the state based on the number of students enrolled in special education programs. What he was getting from you earlier on, what would you characterize those as all having been related services? Because he was getting occupational therapy and several other types was my remembrance. What's significant about the services he was receiving is he was receiving those under an IEP that he brought with him from California. States are free to do a maximization approach, and states are free to, within their state regulations, identify a larger number of students as being eligible for related services. As long as they're not using that as a pass through to get federal money. So he may have only been receiving related services all along. California? Based on the California IEP that he brought with him. Kentucky could do that without. If Kentucky passed laws to that effect and segregated the services provided to those students who don't meet the federal eligibility requirement but only met this heightened state requirement, Kentucky could. Kentucky has not adopted regs or statute to that effect. Let me take you back to those three letters that you referred to because they're referred to at pages 20, 21 of your brief. And even in your brief, it says the position educational performance is not limited to academic performance. Then the letter to Clark is the one that seems to support your position because it does say in so many words, if a child has an impairment but needs only related services, the child is not a child with a disability. I mean, that's the one that supports you because then in the letter to Anonymous, it says a child performing well academically might still require special education and related services, which supports Mr. Dove. Only if he presented any evidence. No, I understand, but the question, yeah, it's not like all three of these letters support your position. In fact, they don't. They are antagonistic to the most negative view that you don't look outside the school because it's specifically. Which, again, is not a position that we've argued. Right, I mean, it specifically says that you should consider non-academic measures as well, which we just have to assess Judge Reeves and the district court. But in that letter to Clark, is that supported anyplace else? Do we sort of owe any deference to that? You know, we won't get into Chevron, Skidmore, our, or is that a due weight consideration? I believe that is the agency's interpretation of its regs. That is, whether it's owed deference, the word and has a simple meaning, and by reason thereof requires special education and related services. I don't think the court is free to convert that into a disjunctive. Anything else? Thank you, Your Honors. Dove, you have your three minutes for rebuttal. Thank you, Your Honor. Judge Cook, I just want to answer your question. Special teaching, if you look at the record from the private service providers that were treating QW during this period of time, he had sensory and communication issues. He had tone disorder. He had, you know, he was three years behind in cognitive functioning, even though he was academically, I mean, the child is gifted. He has an IQ of over 140, but his cognitive functioning, his ability to have empathy for other students, his ability to code communications with other students, he could not do. It sounds to me like we're talking about the social, psychological, and the question is whether he needed special teaching in order to do the academic work. Yes. He couldn't follow the teacher's language. The question would be, more importantly, not what I'm asking, but whether the record and the briefing supports that prong. Yes, the record does. We're told that it doesn't, and I, frankly, did not yet see it, so I'll look again. Well, I'd appreciate it if you looked again, because I think clearly his— Can you point me to where I might find it? Yes, if you look at Dr. Carey's evaluation. Well, no, I'm looking for your argument to this. Oh, my argument is in when it's— Regarding prong two. Oh, concerning prong two? Just regarding prong two. I'm just sort of looking for that. Inasmuch as it is conjunctive, thou shalt have both. Yeah, I think if you look in my brief that quotes Dr. Nadoff and quotes— What part of the brief is it? Where in the brief is it? Argument. I'm sorry, judges, I don't have the exact page, but it's in here with Dr. Reed and Dr. Nadoff, who both perform— who both work with QW over the— Let's see. We also have, on page 28, we also have Dr. Richardson who talks about his narrative skills, which he says delay exhibits poor inferring skills. This is stuff that's framed in terms of this prong two point. Yes, absolutely, yes. And then you look in the— Stuff about making inferences on page 29, is that a— 29, yes, sir, would be— Do we have any testimony, I guess, looking— any testimony from educators of QW who say this child— and we had plenty of people testify. Anybody say this child needs special tutoring in order to get the grades he's getting? I think not. I think the record will not reflect that, but I think that basically gets back to the argument, is that they're not looking at QW as the whole child. This is a child that's sitting there stimming in the classroom. This is a child that is not isolated. And I think you've got— I appreciate that. I get that point. Okay, okay. And so you needn't repeat it for me, but I do quite understand that that's the main thrust. And I think you've got to look at this in the broader picture of the idea. I mean, if you look at this, which wasn't addressed, which— and I will admit QW's not there yet. He, at this point, is now 13. He is going to start transition services next year at 14. And you look at Honig versus Doe. You look at what's going on— I'm timed up. He's fired, but when you say he's going to start transition services, if he's not labeled as disabled— Oh, I'm sorry. He would be. He would be if he were. Okay. He would be. We know about transition. I've got another case on transition. Yeah. I apologize, Judge Bonk. But the problem is, if you look at the— Counsel, I think your time has expired. All right. Just look at this. That red light. No. I like that red light. Okay. Thank you. Thank you very much. I think we have the gist of the argument on both sides. Thank you. Thank you, Counsel. That case will be submitted, and the clerk may call the next.